IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARTIN J. WALSH, | : | |
| SECRETARY OF LABOR, | : | CIVIL ACTION |
| UNITED STATES | : | |
| DEPARTMENT OF LABOR, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EASTERN MONTGOMERY COUNTY | : | |
| AREA LOCAL 2233, AMERICAN | : | |
| POSTAL WORKERS UNION, AFL-CIO, | : | No. 22-1175 |
|     Defendant. | : | |

**MEMORANDUM**

**Schiller, J.**                                                                                                          **November 7, 2022**

The facts of this case are rather straightforward: a local labor organization disqualified a candidate for union president because he failed to indicate he accepted his nomination by circling "accept" on a required form. Plaintiff, Martin J. Walsh, the Secretary of Labor (the "Secretary") brings this action under the Labor-Management Reporting and Disclosure Act (the "LMDRA") against Defendant Eastern Montgomery County Area Local 2233, American Postal Workers Union, AFL-CIO ("Local 2233" or the "Union"). The Secretary argues Local 2233's requirement to indicate one's acceptance of the nomination by circling "accept" on the form was neither reasonable nor reasonably applied in this instance. Local 2233 contends otherwise. Both parties move for summary judgment and there are no material facts in dispute. For the reasons that follow, judgment is entered in favor of Local 2233; its motion for summary judgment is granted and the Secretary's is denied.

**I.   BACKGROUND**

Local 2233 has approximately 570 members who are active or retired United States Postal

1

Service employees in Bucks, Chester, Delaware, and Montgomery Counties in Pennsylvania. (Pl.'s Mem. of Law in Support of Mot. for Summ. J. [Pl.'s Brief], ECF 9, at 3; Joint App., ECF 10, Ex. B.)[1] It is organized under a constitution and passed bylaws governing its internal election procedures. (Exs. A, C.) Elections for Union president occur every three years. (Ex. C at art. VII, § 1; Ex. D.) Before an election, the Union president must appoint an Election Committee consisting of at least five members. (Ex. A at art. 12, § 1.) The Election Committee is responsible for conducting the local elections and deciding "all controversies arising out of the election process." (*Id.* at art. 12, § 8.) Specifically, the Election Committee must provide notice of any upcoming election, host a nomination meeting, verify the eligibility of candidates, and draft and count the ballots. (Ex. C at art. VII, § 5.) But the Election Committee need not notify candidates they are ineligible to run for office. (*See generally* Exs. C, D.)

To be eligible to run for local office, any Union member must be in good standing, among other requirements. (Ex. A at art. 10, § 1.) All candidates must be nominated by themselves or another member. (Ex. C at art. VII, § 4.) Candidates must also accept the nomination. (*Id.*) To do so, the candidate must submit an "Acceptance of Nomination" form to the Election Committee, which he or she could obtain from the Secretary-Treasurer. (*Id.*)

Walter Kolecki was a Union member in good standing who sought to run for Union president. (*See* Exs. G, R, S.) He wished to challenge incumbent president Charles Kukulski. (Ex. G; Pl.'s Brief at 2; Def.'s Mem. of Law in Support of Mot. for Summ. J [Def.'s Brief], ECF 8, at 2-3.)

---

[1] The parties submitted a Joint Appendix containing all Exhibits to which the Court cites throughout this Memorandum. (*See* ECF 10.)

A. **The 2021 Election**

In August 2021, Local 2233 posted a nomination and election notice prepared by its Election Committee. (Ex. D; Pl.'s Brief at 5, Def.'s Brief at 2.) The notice set out instructions for members to follow if they were interested in running in the upcoming election.[2] It said that nominations for president and other Union positions would be accepted at a meeting on September 19 at the Union Hall, but members need not be present to be nominated. (Ex. D.) It also provided that "[c]andidates must accept or decline nominations at the nomination meeting or, if not in attendance, submit a written acceptance (Nomination and Acceptance Form) to the Election Committee Chairperson, received no later than September 22, 2021. Nominations and Acceptance Forms are available, upon request, from the Secretary-Treasurer." (*Id.*)

The Nomination and Acceptance Form includes two forms separated by a thin black line on a single page. (*See* Exs. F, T.) The upper portion is the nomination form, and the lower portion is the acceptance form. A member may nominate himself or another member for office. (Ex. F.) A member must accept or decline a nomination by printing and signing his or her name, writing the name of the office that he or she was nominated for, and circling that he or she either "ACCEPT[S]" or "DECLINE[S]" the nomination to complete the form. (*Id.*) "ACCEPT," "DECLINE," and "(circle one)" are in bold text. (*Id.*)

Due to a construction issue at the Union Hall, the Union's nomination meeting was later rescheduled to September 26 at 10:00 AM and the deadline to submit the Nomination and Acceptance Forms was pushed to September 29. (Ex. E.) Advance notice of this change was provided to all Union members. (*Id.*)

---

[2] The notice tracks what the Union's constitution and bylaws require when holding elections. (*See* Ex. D at art. VII, § 4.)

On September 26, Kolecki asked Union secretary-treasurer Don Liefer for a Nomination and Acceptance Form. (Ex. N.)[3] Kolecki filled out the entire Nomination and Acceptance Form, nominating himself for president. (Ex. F; Pl.'s Brief at 6-7.) On the nomination form, he nominated himself for president, printed his name, and dated the form September 26, 2021. (Ex. F.) On the acceptance form, he printed and signed his name, dated the form September 26, 2021, and wrote "president." (*Id.*) But he did not circle whether he would "ACCEPT" or "DECLINE" his nomination for president. (*Id.*; Pl.'s Brief at 8; Def.'s Brief at 2.) Mary Krohn, an Election Committee member, signed and dated the form in Kolecki's presence, confirming receipt. (Ex. F; Pl.'s Brief at 8.) Kolecki also contemporaneously handed the Election Committee an envelope

Ex. F (Kolecki's Nomination and Acceptance Form)

---

[3]  Leifer did not have a form, so Election Committee member Mary Krohn provided one to him. (Ex. N, P.)

containing three letters addressed to Committee members saying that he nominated himself for president and accepted the nomination, intended to be present for all phases of the election, and requested mailing labels for all Local 2233 members. (*See* Exs. G, H, I; Def.'s Brief at 2; Plaintiff's Brief at 8-9.) The Election Committee recorded that Kolecki was nominated for president. (Pl.'s Brief at 10.)

The next day, the Election Committee reviewed Kolecki's Nomination and Acceptance Form. (Ex. T; Pl.'s Brief at 10; Def.'s Brief at 2.) The Committee noted Kolecki failed to circle "ACCEPT" or "DECLINE." (Exs. N, T; Pl.'s Brief at 10; Def.'s Brief at 2.) Although the deadline to submit the Nomination and Acceptance Form was two days away, the Election Committee determined it would be "unfair and a violation of the bylaws to notify" Kolecki of the deficiency prior to the end of the nomination period. (Def.'s Brief at 2-3; *see also* Pl.'s Brief at 10-11; Ex. T.) Krohn did not believe Kolecki's intent to run for president was "clear" because he had not circled "ACCEPT." (Ex. T.)

The same day, Kolecki emailed Krohn and Howard "Bud" Cauffman, another Election Committee member, asking when he could expect to receive mailing labels and whether the Committee planned to hold a meeting to discuss election rules and procedures. (Ex. K; Pl.'s Brief at 11.) On either September 27 or 28, Kolecki asked Liefer if there were any contested positions other than president and asked when he could expect to receive the mailing labels, but Liefer did not provide a direct answer. (Pl.'s Brief at 11.)

On September 30, Kolecki again emailed Cauffman, saying he had not heard back about the mailing labels and election procedures.[4] (Ex. L; Pl.'s Brief at 11.) He wrote, "I understand

---

[4] Kolecki emailed only Cauffman but addressed his inquiry to the members of the Election Committee. (*See* Ex. L.)

there is only one contested position. This should be a straightforward election process. Please contact me asap." (Ex. L.) Cauffman replied the same day, writing "I am not certain where you got your information concerning contested positions. Close of business on 9/29/2021 was the deadline for mailed nomination/acceptance forms to be received. . . . You will be contacted with all pertinent information in the very near future." (*Id.*)

That same day, the Election Committee mailed Kolecki a letter informing him he was not eligible for the election because he had improperly filled out the Nomination and Acceptance Form. (Ex. M; Pl.'s Brief at 12; Def.'s Brief at 3.) It indicated the Election Committee discovered Kolecki "had not declared, either accepting or declining, the nomination" and disqualified him from the race. (Ex. M.) It cited various Union bylaws and constitutional provisions, including the election appeals procedure, and attached Kolecki's deficient form. (Ex. M.) Many of the other members running for office had completed and submitted identical Nomination and Acceptance Forms and properly circled "ACCEPT." (*See* Ex. U.) Kolecki received the letter October 4. (Ex. N.)

On October 16, the Election Committee announced incumbent president Kukulski was reelected without opposition. (Pl.'s Brief at 13; Answer, ECF 5, at ¶ 59.) Two days later, Kolecki appealed the Election Committee's determination of ineligibility to the National Election Appeals Committee of the American Postal Workers Union, AFL-CIO ("Appeals Committee"). (*See* Exs. O, P; Pl.'s Brief at 13.) In a December 7 letter, the Appeals Committee denied Kolecki's appeal and upheld the Election Committee's determination. (*See* Ex. Q.) Having exhausted his internal remedies, Kolecki appealed to the Secretary of Labor on December 31. (*See* Ex. R.)

The Secretary initiated this litigation and asks this Court to declare the Union's October 2021 election void and order the Union to conduct a new election under its supervision pursuant

to 29 U.S.C. § 482(c), and award the costs incurred carrying out these actions to the Secretary. (Pl.'s Brief at 25; Compl., ECF 1, at 14.) It argues Local 2233's requirement that Kolecki circle "ACCEPT' on his form was an unreasonable qualification or a qualification applied in an unreasonable manner in violation of the LMDRA. In response, Local 2233 argues that the qualification was both reasonable and applied reasonably. Both parties move for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto-Owners Ins. Co v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)) (internal quotations omitted). When both parties move for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-

moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011). It may not, however, make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

### A. The LMRDA

Section 401(e) of the LMRDA governs the election procedures for local and national labor organizations. *See* 29 U.S.C. § 481(e). It requires unions give members a "reasonable opportunity" to nominate candidates for office. *Id.* All members in good standing are eligible to run and hold office "subject to section 504 and to *reasonable qualifications* uniformly imposed" by their labor organizations. *Id.* (emphasis added).[5] "Reasonableness does not have a bright line definition. What is reasonable varies with the circumstances." *Reich v. Local 30, Int'l Bhd. of Teamsters*, 6 F.3d

---

[5] Section 504 prohibits union members convicted of certain serious crimes from holding office thirteen years after their conviction or release from prison. *See* 29 U.S.C. § 504(a); *see also Scalia v. Local 1694, Int'l Longshoremen's Assoc.*, No. 19-2235, 2021 WL 1929205, at *3 (D. Del. May 13, 2021) (Bibas, J.). It is inapposite on the facts of this case..

978, 979 (3d Cir. 1993); *see also* 29 C.F.R. § 452.36(a). The United States Court of Appeals for the Third Circuit held that the test of reasonableness under Title IV of the LMRDA is a balance between the "anti-democratic effects" of the challenged rule and the "[union] interests urged in its support." *Reich*, 3 F.3d at 987 (quoting *Local 3489, United Steelworkers of Am. v. Usery*, 429 U.S. 305, 310 (1977)); *see also Brennan v. Amalgamated Clothing Workers*, 564 F.2d 657, 660 (3d Cir. 1977). When determining the reasonableness of a union rule, "courts generally gauge 'all the circumstances of the particular case,' including the ease of meeting the qualification and the number of members excluded by the operation of the rule in question." *Reich*, 6 F.3d at 988 (quoting *Usery*, 429 U.S. at 313); *see also Wirtz v. Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. 492, 499 (1968) (discussing Congress' intent to prevent unions from imposing qualifications that "substantially deplete the ranks of those who might run in opposition to incumbents"); 29 C.F.R. § 452.36(a).

The Supreme Court has explained Congress did not seek to give unions "broad reach" to restrict candidacy through the LMRDA's "reasonable qualifications uniformly imposed" language. *Wirtz*, 391 U.S. at 499. Rather, Congress sought to restrict eligibility qualifications with the purpose of limiting potential opposition to incumbent union leadership. *See Wirtz*, 391 U.S. at 497; *see also* Note, *Union Elections and the LMRDA: Thirteen Years of Use and Abuse*, 81 Yale L.J. 406, 436-37 (1972). But "[t]he LMRDA does not render unions powerless to restrict candidacies for union office" either. *Usery*, 429 U.S. at 308. Congress sought to strike a "careful balance between 'minimal intervention' in union elections, on one hand, and 'protect[ing] the public interest by assuring that union elections would be conducted in accordance with democratic principles,' on the other." *Acosta v. Local 101, Transp. Workers Union of Am.*, 339 F. Supp. 3d 80, 89 (E.D.N.Y. 2018) (quoting *Wirtz*, 391 U.S. at 496); *see also Wirtz v. Glass Bottle Blowers*

*Ass'n*, 389 U.S. 463, 470-72 (1968); *Hodgson v. Local 6799, United Steelworkers of Am.*, 403 U.S. 333, 338 (1971). It follows that whether a union bylaw or qualification is reasonable "must be measured in terms of its consistency with the [LMRDA]'s command to unions to conduct 'free and democratic' union elections." *Wirtz*, 391 U.S. at 499. The court "must judge the . . . rule not by the burden it imposes on the individual candidate but by its effect on democratic elections." *Usery*, 429 U.S. at 310 n.6.

The Department of Labor has also set forth regulations that—although not binding—may assist when determining a qualification's reasonableness. *See Reich*, 6 F.3d at 986; *Chao v. Bremerton Metal Trades Council*, 294 F.3d 1114, 1122 n.5 (9th Cir. 2002); *Acosta*, 339 F. Supp. 3d at 90. Some factors to consider include the relationship of the qualification to the legitimate needs and interests of the union; the relationship between the qualification and the demands of the union office; the impact of the qualification on broad participation in union affairs; and the degree of difficulty fulfilling a qualification. 29 C.F.R. § 452.36(b). Moreover, the Department of Labor considers "adequate advance notice to the [union] membership" of a qualification an "essential element of reasonableness." 29 C.F.R. § 452.53.

**B. Local 2233's Requirement Is Facially Reasonable.**

The parties disagree whether the circling requirement was reasonable. The Secretary concedes that "[a] requirement that a nominee circle 'accept' on a designated form could be a 'reasonable qualification' if it was (among other things) clearly spelled out in the union's constitution and bylaws" as to provide adequate notice to the membership. (Pl.'s Brief at 18.) Local 2233 argues candidates and membership had adequate notice because the Nomination and Acceptance Form plainly and conspicuously directed members to circle "ACCEPT" or "DECLINE." (Def.'s Response to the Mot. For Summ. J. [Def's Opp.], ECF 12, at 1.)

Although courts have not considered the reasonableness of this exact requirement, some have considered similar *pro forma* requirements. In *Acosta v. Local 101, Transp. Workers of Am.*, the court considered whether a local union's requirement that any candidate hand-deliver a signed letter formally accepting a nomination was reasonable. 339 F. Supp. 3d at 85, 91-92. A local election committee disqualified a member running for union president after she failed to personally submit a signed letter by the deadline despite her clear intent to run. *Id.* at 85-87. As a result, the incumbent president won in an uncontested race. *Id.* at 87. The *Acosta* court held the union's letter requirement was reasonable because it imposed "few, if any" burdens on candidates, did not "reduce the overall pool of eligible candidates," and did not impose a disproportionately burdensome task on challengers rather than incumbents. *Id.* at 91-92;[6] *see also Herman v. N.Y. Metro Area Postal Union*, 30 F. Supp. 2d 636, 645 (S.D.N.Y. 1998) (holding that a rule requiring union candidates to submit their social security numbers, addresses, and positions sought by the end of a nomination meeting was a reasonable qualification).

When courts analyze the reasonableness of qualifications, they closely scrutinize those that automatically eliminate large portions of a union's membership. For example, in *United Steelworkers of America v. Usery*, the Supreme Court held that a meeting-attendance requirement that resulted in the exclusion of 96.5% of union members was not reasonable due its effect on the

---

[6]   The Secretary argues that *Acosta* is distinguishable and inapplicable on these facts. (*See* Pl.'s Opp. to Def's Mot. For Summ. J. [Pl.'s Opp.], ECF 11, at 4-6.) Specifically, he argues that the requirement that ultimately led to the member's disqualification was not the letter requirement but rather the deadline to submit it. (*Id.* at 4.) He argues the disqualified member in *Acosta* had adequate notice of the requirement to submit her letter by the deadline, which made the requirement reasonable, unlike Kolecki. (*Id.* at 4-5.)

The Court disagrees with the Secretary's characterization of *Acosta*. Although he is correct that the deadline ultimately led to the *Acosta* member's disqualification, the court still squarely analyzed the letter requirement and found it reasonable. *See Acosta*, 339 F. Supp. 3d at 90-92

"free choice of membership in selecting its leaders." 429 U.S. at 310; *see also Acosta*, 339 F. Supp. 3d at 91. Similarly, in *Wirtz v. Hotel Employees, Local 6*, the Court held a union's requirement limiting eligibility for its major offices only to those who previously held elective office was unreasonable since it disqualified 93% of the union's membership. *Wirtz*, 391 U.S. at 499-501; *see also Reich*, 6 F.3d at 988.

Here, Local 2233's requirement to circle the word "ACCEPT" on the required form is facially reasonable. The Court finds this situation mirrors the more burdensome—yet reasonable— requirement in *Acosta*. The circling requirement imposes an *de minimis* burden equally on challengers and incumbents. It does not per se disqualify any candidate from running for office and does not interfere with broad participation in union affairs, unlike the disenfranchising restrictions at issue in *Usery* and *Wirtz v. Hotel Employees, Local 6*. The Union also has some ministerial interest in nominees correctly completing the proper forms. For instance, if Union members could nominate each other without requiring the nominee to accept or decline the nomination, the Election Committee would have to administer unwieldy and unnecessarily confusing elections. The Election Committee would need to navigate elections with many additional candidates, including those who would not wish to serve even if they win—which creates the possibility of duplicative elections or unnecessary run-offs. The circling requirement is not a "vague" qualification that introduces subjectivity as the Secretary argues. (*See* Pl.'s Brief at 19.) The requirement to circle "ACCEPT" or "DECLINE" is objective, clear, and simple to follow.[7] The Court finds that when balancing the union's interest in self-governance and

---

[7]    Although the Court only considers the burden the requirement places on the democratic conduct of union elections and not the individual, *see Usery*, 429 U.S. at 310 n.6, it is worth mentioning that Kolecki properly circled "ACCEPT" on a 2003 Nomination and Acceptance Form when he ran for office in the past. (*See* Exs. V, X.)

Congress's interest in ensuring broad participation in fair union elections, the requirement has little anti-democratic effect on Local 2233's elections. Therefore, the Court will not interfere. *See Wirtz*, 391 U.S. at 496; *Wirtz*, 389 U.S. at, 470-72.

As for the Secretary's argument that candidates lacked proper notice of the circling requirement, this is only one factor the Court may consider when determining reasonableness and does not change its analysis. *See Usery*, 429 U.S. at 313 (urging courts to consider "all the circumstances of the particular case" when determining a qualification's reasonableness); *Reich*, 6 F.3d at 988 (same); 29 C.F.R. § 452.36(b) (providing multiple factors for courts to consider when determining reasonableness). Even so, there was adequate notice outlined in the Union's constitution and bylaws, contrary to the Secretary's contention. According to Local 2233's constitution and bylaws, "[a]ll candidates for office must be nominated by themselves or another member" and submit an "Acceptance of Nomination" form to the Election Committee to run.[8] (Ex. C at art. VII, § 4.) The acceptance must be in the form of a "petition provided by the Secretary-Treasurer." (*Id.*). The constitution and bylaws explicitly require candidates like Kolecki to submit an "Acceptance of Nomination" form. The Secretary's argument that the Union must have "clearly spelled out" the circling requirement in its constitution or bylaws to provide adequate notice and be reasonable has no logical end. (Pl.'s Brief at 18.) The Nomination Acceptance Form also requires a nominee to print his or her name, sign his or her name, date the form, and submit it to the Election Committee. (*See* Ex. F.). To hold the Union's failure to amend its constitution or pass a bylaw requiring a candidate perform the bare minimum of ministerial tasks to manifest his or her intent to run for office does not comport with the balance Congress struck in passing the LMDRA.

---

[8] It is not clear whether these rules come from the Union's constitution or bylaws. The Joint Appendix captions these rules as Local 2233's "Constitution & Bylaws" but does not specify which they come from. (*See* Ex. C.)

The form instructs the candidate in bold to "circle one," either "ACCEPT" or "DECLINE." This, combined with the requirement that candidates submit an "Acceptance of Nomination" form, is sufficient notice.

### C. Local 2233's Requirement Was Reasonably Applied.

The Secretary also argues the circling requirement was applied in an unreasonable manner. (Pl.'s Brief at 20-24.) The Court agrees with him that the LMDRA authorizes a challenge when a reasonable rule is applied in an unreasonable manner. *See Reich v. Local 89, Laborers' Int'l Union*, 36 F.3d 1470, 1478 (9th Cir. 1994); *Acosta*, 330 F. Supp. 3d at 92. But the Court's agreement stops there. On these facts, the Secretary fails to demonstrate the circling requirement was applied unreasonably to Kolecki.

The Secretary's primary argument is that Kolecki's disqualification was unreasonable because he had unambiguously manifested his intent to accept the nomination and run for Union president through his conduct, despite his failure to circle the word "ACCEPT." (Pl.'s Brief at 20-23.) The Secretary cites *Donovan v. Local 3122, Communication Workers of America*, 740 F.2d 860 (11th Cir. 1984) and *Hodgson v. Liquor Salesmen's Union Local No. 2*, 444 F.2d 1344 (2d Cir. 1971) for the proposition that courts ought to reject "hypertechnical construction[s]" of union procedural rules that affect rank-and-file members' election-related rights. *Hodgson*, F.2d at 1349-50; *Donovan*, 740 F.2d at 862. But neither case is persuasive or applicable. As Local 2233 argues, *Donovan* and *Hodgson* are inapposite because they concern union members exhausting internal remedial measures as required by 29 U.S.C. § 482. The *Hodgson* and *Donovan* courts' concern about hypertechnical construction of the internal remedies provision rests upon the "assumption that the union's *remedial procedure* would afford a fair opportunity for a reasonable investigation and redress upon the filing of a meritorious complaint." *Hodgson*, 444 F.2d at 1349 (emphasis

14

added); *Donovan*, 740 F.2d at 862. The courts' reasoning does not concern or extend to section 481 or "reasonable qualifications." Moreover, there *has* been fair opportunity and notice of the circling requirement in the Union's bylaws or constitution and on the form itself, which obviates the concern of the *Hodgson* court. *See Hodgson*, 444 F.2d at 1349.

The Secretary also argues the facts here are more similar to those in *Herman v. New York Metro Area Postal Union* than in *Acosta*. (*See* Pl.'s Opp. at 6-7.) In *Herman*, the union required candidates running for office to complete a form by entering their social security numbers, addresses, and positions sought. *Herman*, 30 F. Supp. 2d at 640, 647. But the union's election committee never specified the deadline to return the required form, resulting in the disqualification of all seven challenging candidates and the reelection of the unopposed incumbents. *Id.* at 641-42. The court found that although the rule requiring nominees to submit basic identifying information was reasonable, it was not reasonably applied because the union constitution, election rules, election committee communications, and other submitted evidence did not demonstrate there was an unambiguous submission deadline. *Id.* at 645, 650. Here, in contrast, there was a clear, unambiguous submission deadline. Local 2233 posted notices of the September 22, 2021 submission deadline for Acceptance and Nomination Forms—and when the Election Committee rescheduled nomination meeting, it posted new notices that the deadline was pushed back to September 29, 2021. (*See* Exs. C, E.) Local 2233 did provide the advance notice that the union in *Herman* failed to promulgate.

The Secretary's reasoning runs "directly afoul of the [U]nion's obligation to ensure the qualifications are not just reasonable, but also 'uniformly imposed,'" as the statute commands. *Acosta*, 339 F. Supp. 3d at 94 (quoting 29 U.S.C. § 481(e)). The Election Committee did not notify any other candidates about the status their Acceptance and Nomination Forms. (*See* Pl.'s Opp. at

15

10; Def.'s Brief at 2-3.) The Secretary asks the Court to make a special exception for Kolecki because members of the Election Committee knew he intended to run for president. (Pl.'s Brief at 20-24; Pl.'s Opp. at 10-11.) Indeed, Kolecki did email and send letters to the Election Committee members that indicated his intent to accept the nomination (Exs. G, H, I, K, L.) But to hold that the Election Committee should have waived the express circling requirement only for Kolecki because of its members' knowledge of his subjective intent would contravene the law. "[T]he LMRDA forbids this exact type of discretionary behavior; where the application of a rule depends on the whims or instincts of a given election official, it is per se unreasonable." *Acosta*, 339 F. Supp. 3d at 94. The rule was not unreasonably applied.

## IV. CONCLUSION

For the reasons discussed above, the Court grants judgment in favor of Local 2233 and against the Secretary.

An Order consistent with this Memorandum will be docketed separately.